UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DURWYN TALLEY, | ) | |
| | ) | |
| Plaintiff, | ) | 08 C 5485 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| THOMAS DART, SALVADOR GODINEZ, JOHN MUELLER, and JEAN KIRIAZES, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED MEMORANDUM OPINION AND ORDER**

Plaintiff Durwyn Talley brought this suit under 42 U.S.C. § 1983 against Thomas Dart, Sheriff of Cook County; Salvador Godinez, Executive Director of the Cook County Department of Corrections ("CCDOC"), which operates the Cook County Jail; John Mueller, Assistant Administrator for the Department of Program Services at CCDOC; and Jean Kiriazes, Director of Continuous Quality Improvement and Risk Management ("CQI") at Cermak Health Services, which provides medical care to Cook County Jail inmates. The operative complaint named two other defendants, Doc. 21, but Talley voluntarily dismissed them, Doc. 104. The complaint alleges that Defendants' deliberate indifference to Talley's glaucoma while an inmate at Cook County Jail resulted in a treatment delay that caused permanent damage to his vision. The complaint also alleges deliberate indifference to Talley's dental problems. Defendants have moved for summary judgment. Talley declines to defend the dental claims. Doc. 133 at 7 n.1. With respect to the glaucoma claims, summary judgment is granted as to Talley's individual capacity claims and denied as to the official capacity claims.

**Background**

The facts are stated as favorably to Talley, the non-movant, as permitted by the record and Local Rule 56.1.

**A.     Policies Regarding Medical Care for Cook County Jail Inmates**

Cermak provides medical care to CCDOC inmates and is managed by Cook County; CCDOC is operated by the Sheriff's Department, an entity separate from Cook County. *See Boyce v. Moore*, 314 F.3d 884, 887 n.1 (7th Cir. 2002) ("Cermak is a separate entity from CCDOC and an extension of Cook County Hospital."); *DeGenova v. Sheriff of DuPage Cnty.*, 209 F.3d 973, 976 (7th Cir. 2000) ("Illinois sheriffs have final policymaking authority over jail operations."). Official CCDOC policy stated during the relevant time period: "All inmates are provided health care services at a level appropriate to meet individual and group medical needs." Doc. 126-8 at 2. Cermak and CCDOC collaborated on the formulation, enforcement, and revision of policies and procedures related to inmate health care, including coordination among Cermak and CCDOC personnel.

Official CCDOC policy also established the mechanisms by which inmates could submit grievances regarding medical issues, appeal unfavorable decisions on their grievances, and submit medical health request forms. CCDOC's Program Services department received and processed grievances. Godinez was responsible for Program Services. Mueller, who has no medical training or expertise, managed the grievance process and supervised the Correctional Rehabilitative Workers ("CRWs") who staff Program Services. Program Services did not investigate the veracity or legitimacy of grievances. Instead, when a CRW received a grievance, she determined whether it could be handled within the CCDOC. If so, the grievance was treated as a "request" and sent to the divisional superintendent for an immediate response. When the

grievance related to medical care, Program Services policy generally required that the CRW and Mueller review the grievance, assign it a control number, and send it to Cermak. That said, medical grievances sometimes were processed by Program Services as "requests" and sent for an immediate response directly to the dispensary, a Cermak-staffed medical unit within the Cook County Jail.

CQI, which as noted above is a component of Cermak, received medical grievances, reviewed them, and sent them to either an individual doctor or to Cermak's medical administration. Kiriazes, the Director of CQI, was assisted by Cherri Smith, the CQI Coordinator, who sometimes decided without input from Kiriazes where to refer grievances. Once a grievance was sent to Cermak, Program Services had no further role in its resolution and made no further inquiries, unless the inmate appealed or unless Cermak did not respond to the grievance within five business days. When Cermak responded to a grievance, the grievance was returned to Program Services for confirmation that Cermak has signed it, and Program Services rendered the grievance back to the inmate, who could appeal an adverse decision to an appeal board. No medical professionals served on the appeal board. When an appeal was taken, Mueller and Kiriazes met to determine whether the inmate had received medical services. If Kiriazes had no information to that effect, Mueller recommended that the appeal board accept the grievance and require Cermak to address the medical issue.

Once CQI forwarded a grievance to a doctor or the medical administration, it did not follow up to determine whether the medical issue had been resolved. There was no set procedure by which an inmate learned of the response from the doctor or the medical administration. Kiriazes assumed that the doctor and the inmate communicated with one another, but she did not know whether that actually happened. CQI had no formal procedure to

determine if an inmate had submitted multiple grievances regarding the same issue. If Kiriazes or Cherri Smith recognized that an inmate had filed previous grievances concerning a particular problem, they referred the grievance to the Associate Chair of Cermak's medical department.

Cermak's Patient Scheduling department was responsible for scheduling inmates for medical services at Cermak and at off-site medical facilities. The scheduling process began when a medical staffer generated a referral notification and sent it to Patient Scheduling, which assigned the inmate an appointment based on availability. Two days before the appointment, Patient Scheduling created a "movement list" that was sent to CCDOC, which was responsible for transporting the inmate to Cermak for the appointment. CCDOC's Chief of Security was responsible for arranging inmate transportation. Follow-up appointments were scheduled in the same manner. If an inmate missed an appointment, Patient Scheduling did not investigate why the appointment was missed, but did automatically reschedule it. CCDOC and Cermak did not communicate regarding missed appointments except in limited circumstances, such as when CCDOC experienced an emergency or a transportation failure. If an inmate missed three appointments, Patient Scheduling informed the treating doctor.

**B.     The Treatment of Talley's Glaucoma and Talley's Grievances**

Talley has suffered from glaucoma in his right eye since 1999. Glaucoma is a serious medical condition that causes pressure to build within the eye; if untreated, it can lead to permanent damage to the optic nerve and loss of vision. Treatment consists of various means to reduce pressure within the eye, including prescription medication as a first-line treatment and surgery in serious cases.

When Talley became a CCDOC inmate on February 20, 2008, he noted his glaucoma on a medical intake form. He was treated by Cermak medical personnel on March 6, 2008, and

referred to a Cermak ophthalmologist, Dr. Dimitrios Patrianakos. Dr. Patrianakos measured Talley's Intraocular Pressure ("IOP"), which measures pressure within the eye, and his cup-to-disc ratio ("CD ratio"), which measures the progression of glaucoma. Normal IOP is between 10-21, and the closer the CD ratio approaches 1.0, the greater the damage to the optic nerve. On March 20, 2008, Dr. Patrianakos measured the IOP in Talley's right eye as 36 and the CD ratio as 0.7-0.8. Talley was taking several glaucoma medications at the time and complained to Dr. Patrianakos about their side effects. Talley told Dr. Patrianakos that he thought he was supposed to have surgery for his glaucoma. Dr. Patrianakos prescribed an additional medication and requested a follow-up visit in one week. Dr. Patrianakos knew that Talley's glaucoma would lead to permanent damage to his optic nerve and blindness if not treated properly.

Dr. Patrianakos saw Talley one week later, as scheduled, on March 27, 2008. Talley's right-eye IOP measured 19, and Talley again complained about the side effects of the medication. Dr. Patrianakos told Talley that he wanted to examine him again in two weeks to follow up on his complaints about the side effects. Dr. Patrianakos made a note to that effect. He believed that surgery might be the next option if Talley could not tolerate the side effects. Talley did not see Dr. Patrianakos or any other ophthalmologist until nearly five months later, on August 21, 2008. Talley submitted numerous grievances during that five-month period.

The first grievance was submitted on April 10, 2008. Talley stated that he was supposed to but did not see Dr. Patrianakos that day, and he asked to see a specialist "who cares." Doc. 134-14 at 2. Program Services sent the grievance to CQI, which referred it to medical administration at Cermak. Cherri Smith, the CQI Coordinator, handled the grievance. On April 17, 2008, the grievance was returned to Talley with the notation that it had been "referred to medical services." *Id*. at 3. Talley was not taken to see Dr. Patrianakos. He appealed, saying

that "the meds are not helping me," and the appeal was denied. *Ibid*. Mueller was on the appeals board and agreed that Cermak's response to the grievance would stand. Mueller testified that it was not his responsibility to know what was meant by the phrase "referred to medical services" on Cermak's response. He did not know at the time whether Talley had seen or was being seen by an ophthalmologist, and he assumed that another member of the appeals board had obtained information from Cermak or Kiriazes that led to the board's denial of the appeal. Mueller "had no knowledge of [how] Cermak Health Services … reviewed the complaints or how they address the matter," and to his knowledge CCDOC had no procedure in place to determine the veracity of a grievance. Doc. 134-6 at 12-13. Kiriazes does not remember whether she provided information for Talley's appeal, but believes that Mueller "probably" followed up with "no one" because when she is "not there or available, such as vacations, [grievances] don't—a lot of times they don't get followed up on." Doc. 134-8 at 13.

Talley submitted his second grievance on May 27, 2008. He said that he was "being denied medical treatment from the eye doctor for the past couple of months" and that he "should be seen at least once a month." Doc. 134-15 at 2. Program Services sent the grievance to CQI, where Cherri Smith processed it and sent it to "medical services & div[ision] physician." *Id*. at 3. Talley was not taken to see an ophthalmologist and appealed on June 2, 2008. The appeal claimed that Talley had been "denied medical treatment[] for months" and that the delay "is effecting [sic] my eye." *Ibid*. Mueller met with Kiriazes to discuss the appeal. Kiriazes told Mueller that Talley was on glaucoma medication and that monthly visits are not the standard of practice among ophthalmologists. The appeal was denied on that ground. *Ibid*. Kiriazes did not speak with Dr. Patrianakos, did not know Talley's IOP, and did not realize that Dr. Patrianakos had scheduled a follow-up appointment for Talley back in March. Kiriazes testified that the

information provided to Mueller was based on what she acknowledged was a "bad assumption" that Talley "was being treated and he was okay." Doc. 134-8 at 16-17.

Talley submitted his third grievance on June 4, 2008, before the appeal of the second grievance was decided. Talley wrote that he had "been writing grievances constantly for not receiving treatment from the eye doctor in Cermak," that his glaucoma medications had serious side effects, and that he was losing his vision. Doc. 134-16 at 2. Due to the overlap with the appeal of the second grievance, Program Services processed the third grievance as a request rather than as a grievance. It was not sent to CQI, and CCDOC's responded to the grievance by saying that the issue was pending at the appeals board. *Id*. at 3.

Talley submitted his fourth grievance on June 20, 2008. He stated that he was "writing this grievance in reference to [the] denial of treatment at Cermak Health Clinic, for the eye doctor," that "the medication I take for glaucoma causes me severe breathing problems, which brings me difficulties taking it," and that "I'm losing my vision rapidly in my right eye." Doc. 134-17 at 2. He added: "I made the doctor aware of all these problems months ago. Then he stopped seeing me all together." *Ibid*. Program Services sent the grievance to CQI, which referred it to the jail-site dispensary. There is no ophthalmologist on staff at the dispensary.

Talley finally saw Dr. Patrianakos on August 21, 2008. Talley had not been taking his medications due to the side effects. The IOP in his right eye was measured at 32. Dr. Patrianakos referred Talley for a consultation at Cook County Hospital to see whether surgery would be possible. Doc. 134-12 at 24; Doc. 141 at 18-19; Doc. 146 at 20-21. Talley was not sent to Cook County Hospital. On October 23, 2008, Talley saw Dr. Patrianakos again. Dr. Patrianakos noted that Talley had not yet been to Cook County Hospital and measured Talley's IOP as 37. Doc. 134-12 at 26; Doc. 141 at 19; Doc. 146 at 22. Talley complained again about

the side effects of the glaucoma medication, saying he was experiencing breathing problems. Dr. Patrianakos again referred Talley to Cook County Hospital.

On October 30, 2008, Talley was taken to Cook County Hospital and examined by Dr. Jeffrey Nichols and a resident. His IOP had risen to 58, and his CD ratio was 0.95. Dr. Nichols believed that surgery was the next course of action, given that Talley had stopped taking his medications due to their side effects. Talley was instructed to return to Cook County Hospital on November 3, 2008 to see Dr. Patrianakos for a surgery consultation. Talley was not brought to Cook County Hospital on November 3.

Talley filed his fifth and final grievance on November 10, 2008. He wrote: "I was told [by a Cook County Hospital ophthalmologist] that I needed immediate surgery or I would go blind in my right eye. So the ophthalmologist scheduled me to come back on 11-3-08. … Cook County Jail never took me back to the hospital to see the eye surgeon on my scheduled day." Doc. 134-24 at 2. Katie Smith, the CRW assigned to Talley's division at Cook County Jail, received the grievance. Mueller also read it at some point. Katie Smith did not know that Talley had submitted previous grievances about missed appointments, and did not check the copies that Program Services keeps of grievances. Mueller testified that Katie Smith should have looked at Talley's previous grievances, although there is no policy or procedure that requires CRWs to do so. Katie Smith decided to treat Talley's grievance as a request to be sent to the jail-site dispensary in Talley's division. She spoke to the dispensary's medical staff, who advised her that Talley had been seen on September 15, 2008 and October 17, 2008, and that he was scheduled for an appointment on November 28, 2008. Katie Smith made a notation to this effect as a response to Talley's grievance, and took no further action. She was not told whether the appointments concerned Talley's glaucoma. Harriet Barney-Johnson, the Director of Patient

Scheduling, never saw Talley's grievances, and testified that if she had received them, she "would have [done] the research to see if we had scheduled the patient and if we need to schedule a patient." Doc. 134-9 at 22.

Talley saw Dr. Patrianakos on January 14, 2009. Dr. Patrianakos noted that Talley was supposed to be scheduled for surgery. Talley refused to allow Dr. Patrianakos to examine him. Dr. Patrianakos called Dr. Thomas Patrianakos, his son, at Cook County Hospital to ensure that Talley was scheduled for surgery as soon as possible. On February 5, 2009, Talley underwent glaucoma surgery at Cook County Hospital. Talley claims that the delay in obtaining the surgery resulted in permanent damage to his vision.

### C. The DOJ Letter

On July 11, 2008, the United States Department of Justice ("DOJ") sent Dart and Cook County Board President Todd H. Stroger a letter setting forth the findings of a federal investigation into conditions at Cook County Jail. The DOJ Letter stated that "medical care at [Cook County Jail] falls below the constitutionally required standards of care" in part because "inmates suffered needlessly because medical staff failed to ensure that inmates met scheduled appointments, failed to monitor acute conditions, and failed to timely treat inmates' conditions." Doc 134-26 at 43, 47. The letter added: "[Cook County Jail] fails to provide adequate and timely acute care to inmates with serious or potentially serious acute medical conditions." *Id*. at 47. Regarding the grievance process, DOJ noted that it "reviewed numerous grievance files that alleged the need for medical services … that showed a referral to Cermak, but contained no actual response to the grievance." Doc. 134-27 at 10. DOJ said that "staff involved in the inmate grievance process are frustrated that once a medical or mental health related grievance is referred to Cermak, a response is not forthcoming." *Ibid*. As part of its proposed remedial

measures to "protect the constitutional rights of inmates," the DOJ Letter recommended that Cook County Jail "[p]rovide timely medical appointments and follow-up medical treatment." *Id*. at 30, 35.[*]

## Discussion

Talley brings individual capacity claims against Mueller and Kiriazes, Doc. 21 at ¶¶ 64-74, and official capacity claims against all four defendants, *id*. at ¶¶ 58-63. Defendants seek summary judgment on both sets of claims, which are considered in turn.

### I. The Individual Capacity Claims

Talley at all relevant times was a pretrial detainee in the Cook County Jail, not a convicted inmate in the Illinois Department of Corrections. This distinction is irrelevant for purposes of this case: "Although the Eighth Amendment applies only to convicted persons, pretrial detainees … are entitled to the same basic protections under the Fourteenth Amendment's due process clause, and [the court] appl[ies] the same deliberate indifference standard in both types of cases." *Rosario v. Brawn*, 670 F.3d 816, 820-21 (7th Cir. 2012) (internal quotation marks omitted).

To proceed with his individual capacity claims against Mueller and Kiriazes, Talley must adduce evidence sufficient to permit a reasonable jury to find that they "display[ed] deliberate

---

[*] Talley maintains that the DOJ Letter is admissible under the hearsay exception set forth in Federal Rule of Evidence 803(8)(C). Doc. 134 at ¶ 56 n.5. Defendant Kiriazes disagrees. Doc. 141 at 2-3. The court need not resolve this dispute. This opinion references the DOJ Letter not for the truth of the matters asserted in the letter, but only for the fact that the letter was sent to President Stroger and Sheriff Dart in July 2008, in the midst of Talley's efforts to obtain what he asserts was appropriate medical care. Defendants' summary judgment papers do not argue that the letter is inadmissible for the non-hearsay purpose of showing that the official capacity defendants had been placed on notice by DOJ in July 2008 of possible problems with the provision of medical care and the processing of medical grievances. While that evidentiary objection is forfeited on summary judgment, Defendants may advance the argument at trial.

indifference to a serious medical need." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 301 (7th Cir. 2010). Deliberate indifference has an objective component, that the medical condition be "objectively serious," and a subjective component, that Defendants "acted with a sufficiently culpable state of mind" in that they had "subjective knowledge of the risk to the inmate's health and … disregard[ed] that risk." *Ibid*. Conceding that glaucoma satisfies the objective component of Talley's claim, Kiriazes and Mueller focus on the subjective component.

To have subjective knowledge of the risk to the inmate's health, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and … must also draw the inference." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010); *see also Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008) ("it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk"). Culpability requires more than simple negligent conduct, so even if an official is aware of the substantial risk of serious harm, "he is free from liability if he responded reasonably to the risk, even if the harm ultimately was not averted." *Gayton*, 593 F.3d at 620 (internal quotation marks omitted). The evidence, even resolving all conflicts and drawing all inferences in Talley's favor, would not permit a reasonable jury to find that he satisfied the subjective component of his individual capacity claims against Mueller and Kiriazes.

### A. Mueller

There is insufficient evidence to show that Mueller had subjective knowledge of Talley's medical condition. Mueller's involvement was limited to his role on the appeals board and in supervising Program Services' handling of Talley's grievances. Mueller's job responsibilities did not require him to investigate medical grievances or Cermak's handling of such grievances. His responsibilities, rather, were to determine whether Cermak received and processed a

grievance and, when a grievance was appealed, to ascertain whether Cermak had documentation indicating that medical services had been provided to the inmate. Mueller testified that he at no time had personal knowledge of the seriousness of Talley's condition, and Talley has not suggested otherwise.

Talley concedes that Mueller relied upon Kiriazes's "bad assumption" in handling Talley's appeal of the May 2008 grievance. Doc. 134 at ¶¶ 31-32. Mueller did not know the particulars of Talley's medical condition and treatment regimen; nor did he know that Dr. Patrianakos desired a follow-up appointment for Talley. Kiriazes told Mueller that Talley was on glaucoma medications, that Talley was seeking more medical treatment than was considered appropriate, and that Talley was doing okay. True, it would have required only a simple inquiry for Mueller to figure out that Talley had not been taken to his follow-up appointment. But that was not Mueller's job responsibility, and even if it were, "[i]t is not enough" for purposes of a deliberate indifference claim that the defendant "*ought* to have recognized the risk." *Wragg v. Vill. of Thornton*, 604 F.3d 464, 469 (7th Cir. 2010). Mueller simply did not know that Talley was not receiving medical attention for his glaucoma and that his condition was worsening.

The parties spar over whether Mueller had ultimate say as to whether Program Services processed a grievance as a request or as a grievance. The debate is immaterial, as Mueller cannot be held liable in his individual capacity unless he had subjective knowledge of the seriousness of Talley's medical condition. There is insufficient evidence to find that he did. Mueller did read Talley's November 2008 grievance, which articulated the risks Talley perceived to his health, but Mueller had no basis to ascertain the veracity of Talley's claims because he had no knowledge of Talley's treatment regimen. Of equal if not greater significance is the fact that Katie Smith, the CRW, was assigned to handle the matter. So even if the

grievance put Mueller on notice of Talley's medical situation, it was not unreasonable for Mueller, who had no medical training or expertise, to rely on Katie Smith to carry out her delegated job responsibilities. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively …."); *Johnson v. Doughty*, 433 F.3d 1001, 1010-12 (7th Cir. 2006); *Famous v. Pollard*, 449 F. App'x 515, 518 (7th Cir. 2011) ("Delegation of a prisoner's grievances does not constitute deliberate indifference but the efficient delegation of work."); *Hall v. Love*, 2011 WL 1322476, at *5-6 (S.D. Ill. Apr. 6, 2011); *Lampley v. Mitcheff*, 2009 WL 5322951, at *8-9 (N.D. Ind. Dec. 28, 2009).

**B.     Kiriazes**

Talley also has not adduced evidence sufficient to show that Kiriazes had subjective knowledge of the seriousness of his medical condition. Kiriazes oversaw CQI; supervised Cherri Smith, who as CQI Coordinator decided where to refer Talley's grievances; and participated in the appeals process. Kiriazes knew that Talley was on glaucoma medication when she provided information to Mueller regarding Talley's appeal of the denial of his May 2008 grievance. Kiriazes made a "bad assumption" that Talley was seeing a medical specialist as often as was necessary for his condition and that his glaucoma was being controlled by the prescribed medication. Doc. 141 at 15-16. But it is undisputed that Kiriazes did not *know* that her assumptions were incorrect or that Talley had missed a scheduled appointment. Doc. 134 at ¶¶ 31-32.

The most that can be said about Kiriazes is that she failed to investigate Talley's grievance and thereby failed to discover that Dr. Patrianakos had scheduled a follow-up appointment for Talley. But Kiriazes delegated authority to Cherri Smith to decide where to refer grievances, and pursuant to Cermak policy, Kiriazes did not follow up to determine whether the grievances referred by CQI were resolved. CQI did not formally track whether inmates filed multiple grievances regarding the same problem. CQI did not itself investigate the legitimacy of grievances, but merely forwarded them to the appropriate officials. Thus, while Kiriazes received multiple grievances from Talley concerning his glaucoma, she did not speak with Dr. Patrianakos or Patient Scheduling and did not know that Talley's IOP was elevated. Kiriazes looked into the substance of Talley's grievances only when participating in the appeal relating to the May 2008 grievance, and her understanding at that point was that Talley was requesting medical attention on a monthly basis, which she believed to be above the normal standard observed for glaucoma patients. Because there is no evidence that Kiriazes knew the substantial risk that Talley was facing, she is entitled to summary judgment. *See Hayes*, 546 F.3d at 527-28.

## II. The Official Capacity Claims

Although technically brought against Dart, Godinez, Mueller, and Kiriazes, Talley's official capacity claims are, in every practical sense, claims against Cook County and the Cook County Sheriff's Department. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("Official-capacity suits … generally represent only another way of pleading an action against an entity of which an officer is an agent. … [A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.") (internal citation and quotation marks omitted); *Sow v. Fortville Police Dep't*, 636 F.3d 293, 300 (7th Cir. 2011). The grant of summary judgment to

Mueller and Kiriazes on the individual capacity claims poses no bar to the official capacity claims. *See Thomas*, 604 F.3d at 304 ("we find unpersuasive the County's argument that it cannot be held liable under *Monell* because none of its employees were found to have violated [the decedent's] constitutional rights").

The official capacity claims are governed by the municipal liability standards set forth in *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *See Estate of Sims ex rel. Sims v. Cnty. of Bureau*, 506 F.3d 509, 514 (7th Cir. 2007). For municipal liability to attach under § 1983, the plaintiff must establish "that an official policy or custom not only caused the constitutional violation, but was the moving force behind it." *Sims*, 506 F.3d at 514 (internal quotation marks omitted). "An official policy or custom may be established by means of [1] an express policy, [2] a widespread practice which, although unwritten, is so entrenched and well-known as to carry the force of policy, or [3] through the actions of an individual who possesses the authority to make final policy decisions on behalf of the municipality or corporation." *Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011) (internal quotation marks omitted); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 675 (7th Cir. 2012).

Important for present purposes, an unconstitutional municipal policy "may take the form of an implicit policy or a gap in expressed policies." *Thomas*, 604 F.3d at 303 (internal citation omitted); *see also ibid.* ("in situations where rules or regulations are required to remedy a potentially dangerous practice, the County's failure to make a policy is also actionable"); *Phelan v. Cook Cnty.*, 463 F.3d 773, 790 (7th Cir. 2006). "Both in the 'widespread practice' implicit policy cases and in the cases attacking gaps in express policies, what is needed is evidence that there is a true municipal policy at issue, not a random event. … [L]iability should be imposed

only when the degree of fault rises to the level of deliberate indifference to rights, that is, where the municipality's choice to follow a course of action is made from among various alternatives by … policymakers." *Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005) (internal quotation marks omitted). While recognizing that the Seventh Circuit has instructed that caution is warranted when it comes to finding municipal liability based on implicit policies or gaps in express policies, *see ibid*., the court concludes that Talley has adduced facts sufficient to permit a reasonable jury to find for him on the official capacity claims.

Simply stated, and taking the facts in the light most favorable to Talley, the policies in place at CCDOC and Cermak in 2008 seem destined to ensure that the right hand would not know not what the left hand was doing or had done. The policies created a substantial risk of serious harm to inmates like Talley who suffer from serious medical conditions. True, official CCDOC policy required that all inmates be "provided health care services at a level appropriate to meet individual and group medical needs." Doc. 126-8 at 2. Yet the facts of this case (resolving all factual disputes in Talley's favor) show that Talley was deprived of timely medical care for an objectively serious medical need. The reason, a reasonable jury could conclude, is that CCDOC and Cermak had no policies and procedures in place to ensure that CCDOC (the entity responsible for physical detention) and Cermak (the entity responsible for scheduling and providing medical care) communicated regarding whether inmates actually were attending scheduled medical appointments and receiving the medical care they were supposed to receive.

There is evidence of record to suggest the following: Patient Scheduling did not ask CCDOC why an inmate missed a scheduled appointment; CCDOC had no policy to ensure that an inmate was scheduled for another appointment if he was not brought to the scheduled one; CCDOC did not inquire into *how* Cermak processed grievances and came to its decisions,

confining its role to ensuring that Cermak received and decided grievances and to accepting Cermak's proffered explanations when adjudicating appeals. There were no policies that allowed for communication within each entity to ensure that serious medical conditions were appropriately treated. At Cermak, CQI did not follow up once a grievance was referred to a doctor or to medical administration; it was simply assumed that the inmate and the doctor communicated. Nor did CQI check to see if an inmate had filed multiple grievances regarding the same medical issue. CQI did not coordinate with Patient Scheduling to ascertain whether an inmate who claimed to have not been taken to a scheduled appointment indeed was scheduled for that appointment. When dealing with grievances, Program Services did not check with other components of CCDOC to ascertain if a patient had been taken to a scheduled appointment. And in Talley's situation, much of this happened after Sheriff Dart and President Stroger had received the DOJ Letter. *See Thomas*, 604 F.3d at 303 (county policymakers "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff").

A reasonable jury also could conclude that these policy gaps resulted in medical care at Cook County Jail falling below the constitutionally required standard and, as a factual matter, that the gaps resulted in delays in treating Talley's glaucoma that caused permanent damage to his vision. The record does not conclusively establish why Talley never made it to his April 10, 2008 follow-up appointment with Dr. Patrianakos. Did Cermak fail to log the appointment into its system? Did it fail to include Talley on the movement list sent to CCDOC? Whatever the cause, the delay easily could have been remedied shortly after the filing of Talley's first grievance on April 10, 2008. But CQI did not coordinate with Patient Scheduling, and CQI did not follow up after referring the grievance to Cermak's medical administration. What happened

after CQI's referral also is unclear; the point, however, is that Talley's missed appointment seems to have been an obvious error that Cermak easily could have rectified. If Cermak had a policy to ensure that CQI investigated grievances alleging missed scheduled appointments—a simple phone call to Dr. Patrianakos would have sufficed—Talley may well have been seen by Dr. Patrianakos soon after his April 10, 2008 grievance rather than on August 21, 2008. And if Talley had been seen earlier, Dr. Patrianakos may have decided that the medications were inappropriate and that surgery should have proceeded at that point.

A jury also could conclude that the delay ensuing after August 21, 2008, when Dr. Patrianakos referred Talley to Cook County Hospital, was caused by a significant and unconstitutional gap in policy. Dr. Patrianakos appears to have appropriately noted on August 21, 2008 and October 23, 2008 that Talley should be referred for medical consultation. Cook County Hospital informed Talley that he should return on October 30, a week after his October 23 appointment with Dr. Patrianakos, but Talley was not brought back to the hospital until his surgery on February 5, 2009. Talley filed a grievance to this effect on November 10, 2008. Had Program Services had a policy requiring CRWs to check an inmate's previous medical grievances, or to ask Patient Scheduling or a Cermak specialist directly whether an inmate had a scheduled appointment, Talley likely would have received medical treatment in a more timely manner. In the end, it was Dr. Patrianakos's personal initiative that brought Talley to the operating table. Had Dr. Patrianakos not taken action outside the normal bureaucratic process, Talley could have waited even longer for surgery.

All this makes for a viable official capacity claim. Dart, Godinez, and Mueller argue that they are entitled to qualified immunity on the official capacity claim. Doc. 124 at 13-14. The argument is meritless. As the Seventh Circuit has held, "it is well established that the qualified

immunity doctrine does not apply to official capacity claims." *Sanville v. McCaughtry*, 266 F.3d 724, 732 (7th Cir. 2001); *see also Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000) (same) (citing cases).

**Conclusion**

Defendants' motions for summary judgment are granted in part and denied in part. All Defendants are entitled to summary judgment on Talley's dental claims. Mueller and Kiriazes are entitled to summary judgment on the individual capacity claims against them. Summary judgment is denied as to the official capacity claims regarding the treatment of Talley's glaucoma; those claims will proceed to trial. It bears repeating that the court's summary judgment ruling rests on a factual predicate that resolves all material disputes in Talley's favor; the jury, of course, may see things differently.

May 24, 2012

United States District Judge